IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| OBA WILSON, | : | |
| *Plaintiff* | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| CHILDREN'S HOSPITAL OF | : | |
| PHILADELPHIA, | : | No. 21-5246 |
| *Defendant* | : | |

**MEMORANDUM**

PRATTER, J.                                                                                                         NOVEMBER 20, 2023

Plaintiff Oba Wilson alleges that he experienced race and disability discrimination while working at the Children's Hospital of Philadelphia ("CHOP"). At the close of discovery, CHOP filed a motion for summary judgment on all of Mr. Wilson's remaining claims.[1] Those claims, too, must be chopped away because, with the benefit of discovery and a record before the parties, there is no genuine issue of material fact by which any of Mr. Wilson's claims could survive. Thus, the Court grants CHOP's Motion for Summary Judgment.

BACKGROUND

Oba Wilson, a Black male, began working for the Children's Hospital of Philadelphia on June 11, 2001 as a General Service Worker, where he was responsible for custodial work at the main hospital. In 2017, Mr. Wilson began reporting to Operations Manager Theresa "Terri" Higginson. Mr. Wilson testified that Ms. Higginson was biased against Black employees at CHOP because Ms. Higginson interacted with "upper management[,]" a majority of whom are from

---

[1] The Court previously dismissed Mr. Wilson's Pennsylvania Human Relations Act claims. *See* Doc. No. 15.

"different ethnic groups," in a more positive way than she did with General Service Workers, a significant number of whom are Black.

In April 2019, Mr. Wilson met with Ms. Higginson to request six-month personal leave pursuant to his union's collective bargaining agreement ("CBA") because he needed time off to care for his ill fiancée. Ms. Higginson initially replied with words to the effect of "You're requesting a non-paid leave of absence when you already take FMLA leave?" Ms. Higginson told Mr. Wilson that, because he was requesting leave related to a *medical* issue, he had to request the leave through Unum, a third-party administrator that managed CHOP employees' medical and other leave requests. Mr. Wilson then contacted a union delegate because he believed his request was for personal leave and that Ms. Higginson was confused about the type of leave he was requesting. Ms. Higginson told Mr. Wilson that the department could likely approve a leave of one month but could not grant a leave of two to six months due to operational needs. Ms. Higginson, working with the department's management, ultimately approved personal leave for Mr. Wilson from May 6, 2019 to June 8, 2019. Ms. Higginson approved a requested extension of this leave to June 29, 2019.

Mr. Wilson requested another extension of his personal leave from Ms. Higginson in June 2019, but when she did not respond to his communication, Mr. Wilson instead spoke to Darryl Benjamin, a human resources employee. Mr. Wilson described his fiancée's health condition to Mr. Benjamin, who sympathized with Mr. Wilson because his fiancée had passed away from the same condition. Mr. Wilson testified that he told Mr. Benjamin about the remark Ms. Higginson made regarding employees taking leave under the Family and Medical Leave Act ("FMLA") when Mr. Wilson originally requested personal leave. According to Mr. Wilson, Mr. Benjamin told him that the decision to extend leave was determined by Mr. Wilson's management team and that if he

needed to remain out of work to care for his fiancée, he could resign employment and reapply. Once aware of Mr. Wilson's leave request, Ms. Higginson discussed the request with other management members and ultimately denied Mr. Wilson additional leave because of operational needs. Mr. Wilson then returned to work on June 29, 2019.

On August 28, 2019, Mr. Wilson experienced a panic attack at work, and his doctor then wrote him a note excusing him from work from the end of August to the end of September. Mr. Wilson's doctor indicated that Mr. Wilson became more anxious when working in the hospital because it triggered memories of Mr. Wilson's experience with his sick fiancée. Unum personnel informed Mr. Wilson that he was eligible for continuous FMLA leave and employee medical leave under the CBA. Unum approved Mr. Wilson's request for short-term disability benefits effective in early September, and Mr. Wilson remained out on leave while collecting short-term disability benefits through the end of February 2020. Unum then approved Mr. Wilson's request for long-term disability benefits from the end of February through the end of July 2020.

Ms. Higginson testified that, in June 2020, she consulted with department management to determine whether it was feasible to permit Mr. Wilson to remain out on leave any longer due to operational needs. Ms. Higginson testified that she and management personnel determined that Mr. Wilson's ongoing absence imposed a hardship on CHOP where his position could no longer be held open. On June 16, 2020, CHOP sent Mr. Wilson a letter informing him of his employment termination.

At that time, neither Mr. Wilson nor his doctor had an anticipated return-to-work date for Mr. Wilson. Mr. Wilson further testified that he was unable to work in any hospital because working in a hospital exacerbated his anxiety condition. During Mr. Wilson's medical leave starting in September 2019, neither Mr. Wilson nor his doctor communicated to CHOP or to Unum

about any accommodations or modifications that would permit Mr. Wilson to return to work and perform his job functions.

It is undisputed that Mr. Wilson first contacted the Equal Employment Opportunity Commission about filing a Charge of Discrimination in connection with his employment with CHOP on March 27, 2021. He then filed a Charge of Discrimination on March 30, 2021. Mr. Wilson's first contact with the EEOC occurred approximately 638 days after the denial of his request for personal leave due to his fiancée's condition in June 2019.

Mr. Wilson avers that CHOP discriminated against him because of his disability, his fiancée's disability, and his race. He further claims that CHOP retaliated against him for engaging in alleged protected activity. The Court previously dismissed Mr. Wilson's claims under the Pennsylvania Human Relations Act, and now CHOP has filed a motion for summary judgment on Mr. Wilson's remaining discrimination and retaliation claims under the Americans with Disability Act ("ADA") and Title VII. After filing a motion for an extension of time to respond to CHOP's motion for summary judgment that the Court granted, Mr. Wilson filed his opposition. The Court then heard oral argument from both parties regarding the motion for summary judgment.

### LEGAL STANDARD

A party moving for summary judgment must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "genuine" dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "material" if it "might affect the outcome of the suit under the governing law." *Id.* "Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing 'sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Power v. Lockheed Martin Corp.*, 419 F.

4

Supp. 3d 878, 888–89 (E.D. Pa. 2020) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

The Court must draw factual inferences in the non-moving party's favor. *See Doe v. CARS Prot. Plus, Inc.*, 527 F.3d 358, 362 (3d Cir. 2008). Moreover, summary judgment should "be used sparingly in employment discrimination cases." *Id.* at 369. To survive at the summary judgment stage, a non-movant need only show that either "sufficient evidence support[s] the claimed factual dispute," *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968), or "there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed." *Nathanson v. Med. Coll. of Pa.*, 926 F.2d 1368, 1380 (3d Cir. 1991).

## DISCUSSION

### I. Mr. Wilson's Claims Regarding His Request for Extension of Personal Leave Related to His Fiancée's Illness

In the Complaint, Mr. Wilson alleges that the circumstances surrounding his denial of personal leave in light of his fiancée's illness constitute unlawful discrimination. However, before a plaintiff can bring a Title VII or ADA claim, he or she must first file a complaint with the Equal Employment Opportunity Commission within 300 days of the alleged "unlawful employment practice." *Valetin v. Manpower Grp. Sols.*, 792 F. App'x 208, 210 (3d Cir. 2019); *Velez v. QVC, Inc.*, 227 F. Supp. 2d 384, 296 (E.D. Pa. 2002) (*citing* 42 U.S.C. §§ 20003-5(f)). If a plaintiff fails to file an EEOC complaint within 300 days, he or she cannot bring suit. *Miles v. City of Phila.*, No. 17-414, 2018 WL 2465170, at *4 (E.D. Pa. May 30, 2018) (*citing Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)).

Here, as described above, Mr. Wilson's request for an extension of his personal leave occurred on June 28, 2019. He did not contact the EEOC until March 27, 2021—638 days later. His actual EEOC complaint was not filed until March 30, 2021. Thus, these claims are time-barred.

5

Second, the denial of an extension for *personal* leave is not an adverse *employment* action within the meaning of Title VII or the ADA. An adverse employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Betts v. Summit Oaks Hosp.*, 687 F. App'x 206, 207 (3d Cir. 2017) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). Denial of an employee's request for discretionary leave does not satisfy this standard. *See, e.g., Mieczkowski v. York City Sch. Dist.*, 414 F. App'x 441, 445-47 (3d Cir. 2011) (no adverse action where plaintiff was "arbitrarily asked to cancel vacation days"); *Anselmo v. City of Philadelphia*, No. 18-5160, 2021 WL 308132, at *13 (E.D. Pa. Jan. 29, 2021) ("[T]he denial of request for leave alone does not constitute an adverse employment action."). Because denying Mr. Wilson's extension of leave did not affect his pay, title, duties, or benefits, it is not an adverse action upon which a Title VII or ADA claim can be premised.

Mr. Wilson does not contest the fact that these claims related to his request for personal leave to care for his fiancée in June 2019 are time-barred and says he merely includes the denial as circumstantial evidence to support his other claims, which the Court analyzes in turn.

**II.    Mr. Wilson's Discrimination Claims**

    **A.  ADA Claim**

A claim of discrimination under the ADA proceeds under the *McDonnell Douglas* burden-shifting framework. *Hatch v. Franklin Cnty.*, 755 F. App'x 194, 198 (3d Cir. 2018). Under that framework, the plaintiff must first present evidence "sufficient to support a *prima facie* case of discrimination." *Dudhi v. Temple Health Oaks Lung Ctr.*, 834 F. App'x 727, 728 (3d Cir. 2020). If the plaintiff makes a *prima facie* case, the burden shifts to the employer who must then "identify a legitimate, nondiscriminatory reason for its adverse employment decision." *Id.* at 729. If the

6

employer then can proffer a nondiscriminatory reason, the burden shifts back to the plaintiff, who must show that the employer's nondiscriminatory reason was pretextual. *Id.*

Mr. Wilson claims that he was fired due to his anxiety, in violation of the ADA.[2] CHOP argues that this claim fails as a matter of law because (1) Mr. Wilson was not qualified to perform the essential functions of his job as of the time of his firing; (2) there is no evidence that Mr. Wilson was fired because of his disability; and (3) Mr. Wilson has provided no evidence to prove that CHOP's proffered nondiscriminatory reason for firing him was pretextual.

### 1. Mr. Wilson's Qualifications

Whether a plaintiff is qualified within the meaning of the ADA involves two inquiries: (1) whether the individual has the requisite skill, experience, education, and other job-related requirements of the position; and (2) whether the individual, with or without reasonable accommodation, can perform the essential functions of that position. *See* 29 C.F.R. § 1630.2(n); *Buskirk v. Apollo Metals*, 307 F.3d 160, 168 (3d Cir. 2002). This determination must be made as of the time of the adverse employment action, which here is the date that CHOP terminated Mr. Wilson's employment: June 16, 2020. *Gaul v. Lucent Tech.*, 134 F.3d 576, 580 (3d Cir. 1998).

The parties do not dispute that Mr. Wilson previously had the requisite skills and training for his former position. Mr. Wilson worked successfully in his position from 2001 until 2018, and there is nothing to suggest that his education, training, or skills disappeared from 2018 to June 2020.

However, CHOP argues that Mr. Wilson could not perform the essential functions of his former position, with or without a reasonable accommodation, at the time of his employment

---

[2] Mr. Wilson's initial request for extended leave was for his fiancée's illness, not his own disability. At that time, his only disability was sinusitis, and he does not bring any ADA claim here based on that disability.

7

termination in June 2020. As highlighted in Mr. Wilson's own deposition testimony, Mr. Wilson was on long-term disability from February 28, 2020 through July 27, 2020, and during that period he was unable to work at CHOP. Wilson Dep. Tr. at 313:4-8, 315:6-19. For example, when asked whether he could work at CHOP or any other hospital environment due to his medical condition *in any capacity*, Mr. Wilson testified that he could not. *Id.* at 315:6-19. It seems to be a straightforward syllogism that a hospital employee who describes himself as unable to work at any hospital lacks qualifications to be a hospital worker.

In response, Mr. Wilson does not point to any other evidence—such as medical records or the opinion of a vocational expert—suggesting that he could have performed his hospital worker job as of June 2020. He contends that his "almost 19-year career in the GSW position are evidence of his qualification for the position[.]"[3] But as discussed above, his prior experience only goes to his education, training, and skill—not his actual ability to work *in June 2020*. Mr. Wilson's own deposition testimony establishes that he was not qualified for his position within the meaning of the ADA because he could not perform the essential functions of the job. *See Garner v. School Dist. of Philadelphia*, 63 F. Supp. 3d 483, 491 (E.D. Pa. 2014) ("Because the testimony and medical evidence establishes that [Plaintiff] believed that he was never able to return to work . . . with or without a reasonable accommodation, he is not a 'qualified' individual with a disability as contemplated by the ADA.").

Thus, because Mr. Wilson has presented no evidence that he could perform the essential functions of his job as a hospital worker, with or without a reasonable accommodation, he cannot make out a *prima facie* case of discrimination.

---

[3] Though Mr. Wilson makes this argument in connection with his racial discrimination claim, he merely argues that he is a qualified individual for purposes of his ADA discrimination "[a]s discussed above" in his briefing related to his racial discrimination claim.

8

## 2. Whether Mr. Wilson was Fired Because of His Disability[4]

To raise an inference of intentional disability discrimination, "a plaintiff may either (1) introduce evidence of comparators (i.e., similarly situated employees who (a) were not members of the same protected class and (b) were treated more favorably under similar circumstances); or (2) rely on circumstantial evidence that otherwise shows a causal nexus between [his] membership in a protected class and the adverse employment action." *Baez v. The Hill at Whitemarsh*, No. 20-5989, 2022 WL 103188, at *3 (E.D. Pa. Jan. 11, 2022) (citing *Greene v. V. I. Water & Power Auth.*, 557 F. App'x 189, 196 (3d Cir. 2014)).

Here, Mr. Wilson has not identified any comparators in this case, and he is apparently not aware of any employees who took as much leave as he did without being terminated. *See* Wilson Dep. Tr. at 362:20-24 (When asked "[a]re you aware of any employee at CHOP who was not terminated after they were out on leave for over nine months without an expected return to work date[,]" Mr. Wilson responded, "I'm not aware.").

Regarding the existence (or not) of circumstantial evidence, CHOP argues that there is no evidence that CHOP terminated Mr. Wilson's employment because of his disability. During Mr. Wilson's deposition, when asked what disability was the source of Ms. Higginson's discrimination

---

[4] Mr. Wilson's Response to CHOP's Motion for Summary Judgment and the Complaint are unclear as to whether part of Mr. Wilson's ADA claim is an alleged failure to accommodate. However, Mr. Wilson never requested any accommodation that would enable him to return to work. Because he did not request an accommodation, CHOP was not obliged to provide one. *See Moskowitz v. Neshaminy Sch. Dist.*, No. 20-5016, 2021 WL 5639570, at *3 (E.D. Pa. Dec. 1, 2021) ("[A]n employee must make an initial request for an accommodation in order to trigger an employer's obligation to participate in the interactive process of designing a reasonable accommodation for the employee's disability.") (quotation omitted).
Second, Mr. Wilson never provided any return-to-work date, meaning any extension of leave he requested was open-ended. Open-ended leave is not a reasonable accommodation as a matter of law. *Kieffer v. CPR Restoration & Cleaning Servs., LLC*, 733 F. App'x 632, 637 (3d Cir. 2018) ("[I]ndefinite leave is not a reasonable accommodation.") (citing *Conoshenti v. Public Serv. Elec. & Gas Co.*, 364 F.3d 135, 151 (3d Cir. 2004)). Thus, to the extent that Mr. Wilson alleges a failure-to-accommodate claim, that claim does not survive summary judgment.

and the different treatment he faced, he answered "[m]y FMLA." Wilson Dep. Tr. at 240:22-241:4. When asked "[s]o you believe Ms. Higginson discriminated against you because you had and took FMLA, intermittent FMLA leave?[,]" Mr. Wilson answered "Yes." *Id.* at 242:3-6.

However, discrimination based on use of FMLA leave is not discrimination on the basis of disability. *See Johnson v. JPMorgan Chase & Co.*, 922 F. Supp. 2d 658, 669 (S.D. Ohio 2013) ("[T]he fact that Plaintiff took FMLA leave does not equate to a disability under the anti-discrimination statutes."); *Velasquez v. Constellation Brands US Ops., Inc.*, No. 18-cv-364, 2019 WL 2642510, at *11 (E.D. Cal. June 27, 2019) ("FMLA leave requests, in the context of ADA discrimination . . . do not in [and] of themselves impute knowledge of a disability to an employer."). If Ms. Higginson and CHOP were "singling out" Mr. Wilson for his time off under the FMLA, then the proper claim is one under the FMLA, not the ADA. *Cf. Beird v. Lincoln Univ. of Commonwealth Sys. of Higher Educ.*, 487 F. Supp. 3d 270, 282 (E.D. Pa. 2020) ("However, if Defendant was singling Plaintiff out for her time off, rather than for her or her family members' disabilities, the proper claim is one for FMLA retaliation, not associational disability discrimination.").

### 3. Evidence of Pretext[5]

To survive summary judgment on the issue of pretext, Mr. Wilson must point to evidence from which a reasonable factfinder could either (1) disbelieve CHOP's proffered reason for terminating his employment; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the termination. *See Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). To demonstrate disbelief, a plaintiff must point to "weaknesses,

---

[5] Mr. Wilson also argues that the CBA and CHOP's leave policies were discriminatory. However, because the Court finds that Mr. Wilson has not established a *prima facie* case of discrimination, the Court will not evaluate this argument.

10

implausibilities, inconsistencies, incoherencies, or contradictions" in the proffered reason. *Dewalt v. Alliance Pharma Inc.*, No. 21-1064, 2022 WL 4237483, at *5 (E.D. Pa. Sept. 14, 2022) (citing *Fuentes*, 32 F.3d at 765). To establish that a discriminatory reason was more likely than a legitimate one, a plaintiff must again produce evidence. *Id.*

Here, Mr. Wilson points to no evidence suggesting that CHOP's proffered reason for terminating his employment—that he had used up all his leave with no return date and existing CHOP operational need continued—could be disbelieved. It is undisputed that Mr. Wilson had exhausted his FMLA leave. Under the CBA, he retained recall rights to return to his job a maximum of nine months from the date of the onset of his disability, and by June 2020, Mr. Wilson had been out on leave for over nine months.

Furthermore, Mr. Wilson had not provided CHOP any expected return-to-work date. This led to an assessment of whether CHOP could keep Mr. Wilson's position open, and Ms. Higginson testified that CHOP determined that it could not do so because of operational needs, leading to Mr. Wilson's job termination because of the undisputed fact that neither he nor his doctor communicated with CHOP or Unum any accommodations or modifications that would permit Mr. Wilson to return to work and perform the functions of his job.

Without evidence to discredit or even challenge these facts, Mr. Wilson cannot show pretext. *See Tolliver v. Trinity Parish Found.*, 723 F. App'x 166, 172-72 (3d Cir. 2018) (no reasonable factfinder could disbelieve that exhaustion of leave was the cause for firing where employee could not return to work, had no return date, and did not seek an accommodation). Likewise, Mr. Wilson does not point to any evidence suggesting that a discriminatory reason was more likely than not. Therefore, as a matter of law, Mr. Wilson cannot establish pretext.

### 4. Associational Disability Allegations

The ADA prohibits discrimination on the basis of the known disability of a person with whom an employee has a relationship or association. 42 U.S.C. § 12112(b)(4). Mr. Wilson's complaint alleges that CHOP discriminated against him on the basis of his fiancée's disability by (1) denying his request for an extension of leave on June 28, 2019, and (2) firing him on June 16, 2020. Compl. ¶¶ 66-75.

As discussed above, any claim related to Mr. Wilson's 2019 request is time-barred.[6] Regarding his job termination in 2020, Mr. Wilson must again establish a similar *prima facie* case including, *inter alia*, that he was qualified for his position and that there are circumstances giving rise to the inference that his employment was terminated because of his fiancée's disability. *Dajti v. Penn Cmty. Bank*, No. 20-1483, 2021 WL 1209835, at *7 (E.D. Pa. Mar. 31, 2021).

Once again, this *prima facie* case fails because Mr. Wilson cannot show that he was qualified for his job. Furthermore, Mr. Wilson has not pointed to any evidence of any causal link between Mr. Wilson's job being terminated and his fiancée's disability. Not only are there no comparators or comments to analyze, CHOP actually *gave* Mr. Wilson leave when he requested time to care for his fiancée. Thus, there is no genuine issue of material fact that Mr. Wilson faced associational disability discrimination.

### B. Title VII Race Discrimination Claim

The same *McDonnell Douglas* framework applies to Mr. Wilson's race discrimination claims under Title VII. *Jones v. School Dist. of Philadelphia*, 198 F.3d 403, 410 (3d Cir. 1999). Mr. Wilson must first establish a *prima facie* case by showing (1) that he is a member of a protected

---

[6] On the merits, Mr. Wilson's claim would fare no better. The ADA does not require reasonable accommodations with respect to an employee's family members and does not require giving that employee leave to care for a loved one with a disability. *See Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 510 (3d Cir. 2009).

class; (2) he was qualified for the position; (3) he suffered an adverse employment action and (4) the action occurred under circumstances giving rise to an inference of discrimination. *Id.* The burden then shifts to CHOP to articulate a non-discriminatory reason, and, if CHOP does so, the burden shifts again to Mr. Wilson to produce evidence that CHOP's reason is pretextual. *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 169 (3d Cir. 2013); *Vaughn v. Boeing Co.*, 733 F. App'x 617, 622 (3d Cir. 2018).

Here, Mr. Wilson's Title VII race discrimination claim cannot survive summary judgment for the very same reason that his ADA claim fails: he has not established that he was qualified for the job as of June 2020. He again argues that his "almost 19-year career in the GSW position are evidence of his qualification for the position[.]" Once again, this does not meet the threshold of the *McDonnell Douglas* framework because it says nothing as to whether Mr. Wilson could perform his job *in June 2020*. Thus, the Court grants summary judgment on Mr. Wilson's Title VII racial discrimination claim for the same reason it grants summary judgment on the ADA discrimination claim: failure to dispute the fact that Mr. Wilson was not a qualified individual under the *McDonnell Douglas* framework.

### III. Mr. Wilson's ADA Retaliation Claim[7]

The ADA prohibits employers from retaliating against employees who engage in protected activity, including opposing practices made unlawful by the ADA or making any charge under the ADA. 42 U.S.C. § 12203(a). "To establish a prima facie case of retaliation under the ADA, a plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Krouse v. Am.*

---

[7] Mr. Wilson does not allege a Title VII retaliation claim.

*Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997) (citing *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997)). If the employee makes a prima facie case, "the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its adverse employment action." *Id.* If the employer does so, "the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Id.* at 501.

The Court grants CHOP's Motion for Summary Judgment on Mr. Wilson's retaliation claim because Mr. Wilson has not established a prima facie case of retaliation. Mr. Wilson arguably contends that three[8] instances constitute protected activity; however, none of these establish that Mr. Wilson engaged in a protected activity.

First, there is an argument that Mr. Wilson engaged in protected activity when he requested a continued leave of absence in June 2020 in connection with his own disability. There is no doubt that "[r]equesting an accommodation is a protected employee activity under the ADA." *Sowell v. Kelly Servs., Inc.*, 139 F. Supp. 3d 684, 702 (E.D. Pa. 2015) (citing *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 191 (3d Cir. 2003)). But there is a significant gap in Mr. Wilson's argument: he never requested a continued leave of absence. At most, the record shows that Mr. Wilson remained on leave, provided no return-to-work date, did not communicate with any CHOP or Unum personnel, and did not request additional leave in connection with his anxiety. In fact, Mr. Wilson does not dispute the facts that "[a]t no time during his medical leave beginning September 2019 through June 2020 did Plaintiff or his doctor communicate to CHOP or Unum

---

[8] Mr. Wilson does not make the argument that his request for leave to take care of his fiancée or that his complaint to Mr. Benjamin about Ms. Higginson discriminating against him based on his requests for FMLA leave in June 2019 constitute protected activity in his Response to the Motion for Summary Judgment, nor does he clearly make these arguments in the Complaint. However, because CHOP argues that Mr. Wilson makes these contentions, the Court will analyze whether each constitutes protected activity.

any accommodations or modifications that would permit Plaintiff to return to work and perform his job functions" and that neither Mr. Wilson nor his doctor "ha[d] an estimated return-to-work date for [Mr. Wilson] and never communicated a return-to-work date to CHOP or Unum." Doc. No. 26-2 ¶¶ 124-25. Thus, Mr. Wilson did not engage in a protected activity during this event.

Next, Mr. Wilson is said to claim that he engaged in protected activity when he requested personal leave to care for his fiancée in April 2019 and then requested an extension of that leave in June 2019. But "the plain language of the ADA indicates that the accommodation requirement does not extend to *relatives* of the disabled." *Erdman*, 582 F.3d at 510; *see also Bowie v. Costco Wholesale Corp.*, 2019 WL 3283045, at *11 (D.N.J. July 22, 2019) (holding that the plaintiff was not "retaliated against" "[b]ecause the ADA does not require [the employer] to care for his son, [the employee] has no claim under retaliation since he did not engage in a protected activity in requesting such accommodation"). Furthermore, at that time, Mr. Wilson himself was not yet disabled or protected under the ADA, nor is there any contention that his fiancée was disabled because Mr. Wilson requested leave under the FMLA and his union's CBA, *not* the ADA. Thus, this also does not constitute protected activity.

Finally, Mr. Wilson talking to Mr. Benjamin about Ms. Higginson allegedly discriminating against him based on his repeated requests for FMLA leave does not constitute a protected activity. In his deposition, in this context, Mr. Wilson stated that Ms. Higginson's discrimination concerned Mr. Wilson's use of leave under the FMLA.[9] Again, however, if Ms. Higginson was "singling out"

---

9     Mr. Wilson disputes this fact, arguing that "[a]lthough Plaintiff premised his testimony on his use of FMLA, Plaintiff associated his need to take FMLA with his corresponding disabilities and colloquially was using FMLA to refer to disability leave throughout the deposition." Doc. No. 26-2 ¶ 140(a). Though Mr. Wilson testified that the FMLA was "a form of disability, intermittent[,]" Wilson Dep. Tr. at 241:5-8, when immediately asked afterwards if Ms. Higginson discriminated against him because he had and took "FMLA, intermittent FMLA leave," Mr. Wilson testified "[y]es." Wilson Dep. Tr. at 242:3-6.
     Even if Mr. Wilson's answer were ambiguous and gives rise to a genuine dispute, it does not concern a *genuine issue of material fact* because Mr. Wilson's discussion with Mr. Benjamin occurred

15

Mr. Wilson for his time off under the FMLA, then Mr. Wilson should have brought a claim under the FMLA, not the ADA. *Cf. Beird*, 487 F. Supp. 3d at 282. Thus, Mr. Wilson again fails to demonstrate that he engaged in a protected activity.

### IV. Front and Back Pay Damages

Finally, CHOP contends that Mr. Wilson's claims for front and back pay are barred because he voluntarily removed himself from the labor market and did not seek out comparable employment. As discussed above, Mr. Wilson testified that he could not work in any hospital setting. Mr. Wilson also testified that, after his firing, he never wanted to work for any manager ever again, which is why, in part, he has focused on working as a realtor. Ordinarily, a failure to mitigate damages bars a claim for front or back pay. *See, e.g., Holocheck v. Luzerne Cnty. Head Start, Inc.*, No. 3:CV-04-2082, 2007 WL 954308, at *17 (M.D. Pa. Mar. 28, 2007) (holding that a failure to mitigate precludes any claim for front pay and back pay when a mitigation defense is promptly invoked).

However, Mr. Wilson argues that the Court of Appeals for the Third Circuit precedent in *Booker v. Taylor Milk Company*, 64 F.3d 860 (3d Cir. 1995), ended an absolutist "no-mitigation-no-back-pay" rule. *Booker* was primarily concerned with whether a defendant's failure to mitigate damages barred back pay where the defendant could not have located a job that paid as much as the one from which he had been fired. *Id.* at 866-67. The *Booker* Court distinguished this from a situation in which "plaintiffs failed to seek jobs that would have compensated them completely for their losses and elected to remain unemployed." *Id.* at 867 (citing *Hopkins v. Price Waterhouse*,

---

*before* Mr. Wilson was diagnosed with anxiety, the disability at issue here. Mr. Wilson points to no evidence that there was a causal connection between his conversation with Mr. Benjamin or Ms. Higginson's comments and the alleged retaliation of having his job terminated.

16

920 F.2d 967, 981–82 (D.C. Cir. 1990); *Cowan v. Prudential Ins. Co. of America*, 852 F.2d 688, 690 (2d Cir.1988)).

The fact remains that, even under *Booker*, Mr. Wilson had a duty to mitigate his losses, and he failed to seek a job that would have compensated for his losses from being unemployed. Several other circuit courts of appeal have adopted a rule that a plaintiff's total failure to seek any work constitutes a failure to mitigate that bars back pay. *See, e.g., Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 54 (2d Cir. 1998). The Court of Appeals for the Third Circuit has adopted a similar rule with respect to back pay under the National Labor Relations Act, *see Tubari, Ltd. v. NLRB*, 959 F.2d 451, 459 (3d Cir. 1992) (requiring reasonably diligent attempts to secure substantially equivalent employment as a condition of back pay), and in the employment discrimination context in a nonprecedential opinion. *See Caufield v. Center Area Sch. Dist.*, 133 F. App'x 4, 11 (3d Cir. 2005) (total withdrawal from the employment market constitutes a failure to mitigate that forecloses back and front pay).

Again, Mr. Wilson testified, and maintains, that he has completely withdrawn from the employment market. Based on the caselaw in the Third Circuit, his claims for back pay and front pay are thus foreclosed. But Mr. Wilson instead advances a somewhat novel argument that he has withdrawn from the medical field due to "the trauma sustained at the hands of [CHOP]" and that a jury should decide the extent to which he should have been required to seek other employment. In effect, Mr. Wilson suggests that the alleged discrimination he suffered was to such a significant degree that, as a matter of law, he should not have had to mitigate his losses. Mr. Wilson cites no caselaw for this remarkable argument.

Mr. Wilson testified also, however, that he does not want to work "under other management teams" and never wants to work under a manager again. Wilson Dep. Tr. at 326:11-17. When

asked whether he stopped looking for *any* employment requiring him to work under a manager, Mr. Wilson answered that he has not looked for such employment. *Id.* at 326:18-21. In other words, not only has Mr. Wilson withdrawn from the medical field, but he has also ceased seeking employment in *any* field involving a manager. Moreover, "if the employee has exercised no diligence whatsoever 'the circumstance of a scarcity of work and the possibility that none would have been found even with the use of diligence is irrelevant'" "where the employer shows that 'the discriminates made no search for comparable interim employment.'" *Holocheck*, 2007 WL 954308, at *14 (first quoting *NLRB v. Madison Courier, Inc.*, 472 F.2d 1307, 1319 (D.C. Cir. 1972), then quoting *Tubari*, 959 F.2d at 569)). Thus, Mr. Wilson's claims for front and back pay are barred.

## CONCLUSION

Surviving a motion for summary judgment requires evidence. The record and undisputed material facts have showcased that, in this case, there is no evidence sufficient for Mr. Wilson's claims to continue to a jury. Thus, the Court grants CHOP's Motion for Summary Judgment.

BY THE COURT:

s/ Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE